Our first case in the morning is Blankenship v. Bridgestone. For the appellate, Mr. Davis, for the appellee, Mr. Woodrow, Mr. Peckert, you may proceed. May it please the court, counsel, good morning, your honors. My name is Jack Davis. I represent plaintiffs in this case. And at one point or another in the past 40 years or so, the plaintiffs were employees of the Firestone Tire and Rubber Company. They participated in one way, shape, or form in the manufacturing of tires. They either were tire builders, they worked in curing, final inspection, what have you. And essential to the tire building process is the use of solvents, liquid chemicals that contain an organic compound called benzene. That's what this case is about. And for about the past 100 years, maybe a little less, the scientific, the medical, and the manufacturing community, including the tire building community, have known that exposure, both dermal exposure and inhalation exposure to benzene, causes cancer. Specifically, cancer of the blood and the blood forming organs, more particularly lymphoma and leukemia. Again, that's what this case is all about. Your honors, the plaintiffs filed a three-count complaint alleging intentional torts, fraudulent concealment, battery, and intentional misrepresentation against the defendant Firestone. These torts were pled outside of the Workers' Compensation Act. And the issue before your honors today is simply whether or not the plaintiffs have stated claims upon which relief may be granted to survive Section 5A and the exclusivity doctrine that the defendants argue preempt and bar those claims. I would like to briefly mention, as the defendants have raised in their brief, the propriety of the appellate jurisdiction in this case. And I think in order to do that, a brief discussion of the procedural history of the case may be important, your honors. The plaintiffs initially filed suit in July of 2006. And subsequent to initial filing, there were four amended complaints filed. And ultimately, the fourth amended complaint was dismissed on April 30, 2008, by the trial court with prejudice. Over the course of that nearly two years, almost a year and a half, a little more, discovery was ongoing in this case. In fact, the court allowed the parties to conduct discovery. Depositions were taken. Documentary evidence was discovered. Interrogatories and requests for production were exchanged by both sides. And as that course developed, and as we got to the fourth amended complaint, we had a virtual volume of allegations that we pled against the defendants to support Counts 1, 2, and 3, the intentional tort claims. And I say that to come back full circle, hopefully a bit later, to show that we have met the pleading burden under Section 2615 and under the controlling case law, which we believe is Hanley v. Anarco and Wolford v. Anarco, the intentional tort exception cases. We also believe that from the standpoint of the propriety of this court's jurisdiction, that Rule 304A and the alternative, Rule 301, confer jurisdiction on this court. The reason I say that, Your Honors, is simply this. That after the final dismissal in April 2008 by the trial court of the plaintiff's fourth amended complaint, the rights of these 13 plaintiffs, as against the defendant Firestone, were terminated. They had no more case against Firestone. The case did go on against certain supplier defendants, and that is a bit lax, Your Honors. Forgive me, but over the course of this case, we have come to call the manufacturers and the suppliers of the chemical compounds that included the benzene as the supplier defendants, as the vernacular of the case has developed. And on October 16, 2009, the plaintiff's motion to voluntarily dismiss the action as against the supplier defendants was presented, and without objection from the supplier defendants, was granted by the trial court. The language of that order that was entered on October 16, 2009, contained final and appealable language pursuant to Rule 304A. It is our position, therefore, and according thereto, Your Honors, that Rule 304A allows this court to consider the appeal, and that the order entered on October 16, 2009, made the final order entered back in April of 2008, vis-a-vis the fourth amended complaint and dismissal of that complaint, a final and appealable order. In the alternative, Your Honors, Rule 301 allows this court to consider the appeal, inasmuch as the rule provides that every final judgment in a civil case is appealable as a matter of right. We have cited in our reply brief the Divina v. Meserot case, which we believe has some great language to support our position, inasmuch as the Divina case deals with a voluntary dismissal, and even a refiling during the pendency of the appeal to the Supreme Court in the Divina case. And the language of Divina is pretty clear, Your Honors, that a voluntary dismissal is like any other final judgment, and when it's taken following a final judgment, in this case it was a dismissal of some counterclaims in the lower court, it operates the same way as any other final order. It confers the jurisdiction under Rule 301 in that case to allow the reviewing court to hear the appellate issues. And as the court likely knows, in Divina, during the pendency of the appeal, there was a refiling that occurred by the plaintiffs under Section 217, 13217 of the Code. And the important language in Divina with regard to 13217 is that the refiling did not divest the appellate court of its jurisdiction because it's an entirely new action. It is not a continuation of the same action. So in a word, Your Honors, our position is that the appellate jurisdiction in this case is proper because at the end of the day, the Rule 304A language or the alternative Rule 301 allows this court to review the April 30, 2008 dismissal of the Fourth Amended Complaint. It is as it was in Divina and in the Ryan v. Noyes case cited in Divina. Now, Your Honors, with that said, I would like to move on to the issue of the 2615 matter. Whether or not we can state claims upon which relief may be granted is going to depend on a couple of things. The elements to get around or to bypass the exclusivity doctrine of Section 5A of the Workers' Compensation Act in this State along with the Occupational Disease Act, which for the purposes of this appeal I think the parties will agree can be read in tandem, one of four things can happen or more. Number one, either the injury didn't arise out of the employment. Number two, it wasn't in the course of the employment. Number three, it was non-compensable under the Workers' Compensation Act. Or as your main to this appeal, Your Honors, is that the injury was not accidental. So we focus on that last prong. Why in this case wasn't the injury or weren't the injuries suffered by these 13 plaintiffs, i.e. their contraction of blood cancers, leukemia, lymphoma, whatever the particular disease is, accidental? And why do these claims support intentional tort exceptions to Workers' Compensation Occupational Disease Act And it boils down to this. We submit, Your Honors, that this complaint that we have filed, the Fourth Amended Complaint, and specifically paragraphs 80 through 120 of that complaint, set forth two prongs. A very detailed, factual recitation of what Firestone knew about the hazards of the employment, but more And that's the second prong. What was Firestone's intent in this regard? Paragraphs 80 through 120 of the complaint tell a story. And they tell a story that began well before 1963, the date of the earliest opening of one of the manufacturing plants involved in this case, i.e. the Decatur plant. The plaintiffs worked both at Decatur and one plaintiff worked in the Bloomington plant a majority of the time. For all intents and purposes, we're talking about the old Firestone manufacturing facility that's located on 22nd Street in Decatur. And that story began back in the 1920s when the research started about what the effects were from exposure, both And as that knowledge developed and as the 70s rolled around and the Joint Occupational Health Program was commissioned by the University of North Carolina, which is described in our briefs, Your Honors, and as the participants, including Firestone, gained the knowledge as to what the epidemiological studies were showing in the lead, not substantially certain, would lead to cancers of the blood and the blood-forming organs. It doesn't stop there. Firestone, in their position, I would submit, Your Honors, is that they would have the plaintiffs go well beyond any established standard, whether it be substantial certainty, whether it be specific intent, whether it be any standard that the plaintiffs would plead. No standard is good enough for Firestone. And essentially, they would have absolutely no exception to Section 5A and the specific facts have been alleged that that employer acted with specific intent from liability outside the Workers' Compensation Act and shipped that liability to an innocent employer or a fund that is paid for by innocent employers, i.e., the workers' compensation system here in the State of Illinois. And in effect, the trial court, in no matter what, there is no exception to exclusivity. And you have to bring these claims as a Workers' Compensation Act claim. This case was dismissed at a 2615 level of pleadings. This was not a summary judgment proceeding. And all along, I think it became lost on perhaps everyone involved at the lower court proceedings. I'm talking about both sides. Because we had discovered that we were conducting, we had so much factual development throughout the course of the case, that it almost became a catch-22 for the plaintiffs. Because the more and more that we admitted the complaint and the narrow, more narrowly we tailored the specific intent allegations, the more it worked against us. And the more we believe, and with all due respect, the trial court treated this as a summary judgment proceeding, which at some point, Your Honors, with a straight face, I can't tell you that at some point at the summary judgment level, we may not overcome summary judgment because the court could conclude that there's not a reasonable inference that a jury could make that Firestone acted with a specific intent. Of course, we're not conceding that. But for the purposes of this context, at the 2615 level, we certainly believe that we've borne the burden of pleading with exceeding specificity and far beyond what is required by Hanley and the other cases dealing with that. Mr. Davis, could you give us your best facts that are pled that would show specific intent, assuming you could prove that? Yes, Justice Pope. Paragraphs 80 through 120 of this complaint speak chronologically. But more importantly, when you get towards the end of those paragraphs, we plead that Firestone not only had knowledge and did not reveal the facts concerning the epidemiological studies and the insidious effects of exposure to benzene, but actually took active steps to conceal it by lying to the employers union, employees union, excuse me, by actually lying to treating physicians about what constituents employees at the plant were exposed to. And by the way, that happened as late as 1996 when Gerald McMurray, one of the plaintiffs in this case, was diagnosed with non-Hodgkin's lymphoma, went to his oncologist and his oncologist sent a letter to the industrial hygiene folks at Firestone saying, please let me know what chemical compounds this man is working around so I can decision about what is an etiology or cause of this man's disease process. And the letter that was sent back included no, no insidious constituents, certainly no benzene organic compounds, but rather a harmless list of talcs and powders that have absolutely no bearing or relationship to cancer of the blood or blood forming organs or non-Hodgkin's that when OSHA came in to look at the plant, that steps were taken to thwart that investigation, that most shockingly, the two most shocking facts that I can recite just over these, that when 55 gallon barrels of hexane or naphtha solvents or whatever the compound was, the solvent was, came into this plant from the shippers, that labels, skull and crossbone labels were removed and witnessed to have been removed by people who were deposed in this case. Gerald Fox and another gentleman named Jim Taylor, both former employees who worked in receiving, saw the fact and we pled in the complaint that skull and crossbone labels and warning labels were removed and replaced with O. Rick Kyle was a young researcher performing some of the epidemiological studies for the JOHP at North Carolina, University of North Carolina. He states in one of the memorandums regarding his studies that Firestone had a policy or it appeared that they had a policy of placing workers age 55 or older in higher exposure positions because of cancers of the blood forming organs, leukemia, because it takes 25 or 35 years in some cases to catch leukemia, to use a very poor layman's term. And workers age 55 or older may very well die of old age or the war of attrition than they would from leukemia. Those are the kind of facts that we've pled in the fourth amended and was used in the tire building process that the workers staged a bit of a revolt and said we need to know about these dangers or we're going to quit, we're going to walk off the job. And we allege that as a result of having that experience, Firestone, when they learned about the dangers of benzene and the dangers of exposure to these organic compounds, knew they didn't want to have another situation where production would cease when employees walk off the job after being told that their exposure, both exposure and inhalation, would result in leukemia, a fatal disease. Those are the kind of facts we allege and certainly I don't mean to have that as an exhaustive list, but I think it does represent a list of the more poignant factual allegations to support specific intent. With regard to Hanley versus Anarco, I think that Hanley is important because Hanley involved the Anarco asbestos plant that's no longer in operation in McLean County, Bloomington. And the allegations there were that the plaintiff claimed, number one, that the employer, Anarco, represented the asbestos thus was safe. Number two, that they knew it wasn't. Number three, they knew that the plaintiff would become ill and die if they were wouldn't discover upon their own volition the fact that the asbestos was dangerous and malignant. In Hanley and then in the companion case, Wolford, this court said that that was enough. In your honors, the complaint in this case I'll submit to you goes well beyond the allegations in Hanley. And taken into context, in Hanley all they had was complaint. There was no ability to file a complaint or to attach the documentary evidence that we attached to support these allegations. Another important case, although they did not find that the intentional tort exclusion was met, is the Bearclaw case versus Domino's Pizza. And I think one of the most important passages from that case is the court's finding that if Domino's Pizza knew that there were criminals lying in wait to attack this pizza delivery driver, that it would have been a different outcome. And if that would have been alleged, it would have been a different outcome. Your honors, without being too dramatic and for the sake of saving that, we allege that Firestone lied in wait, that they knew about these dangers, they took acts to conceal them, not acts of omission, acts of commission to conceal them from its dealt with. I notice my time is up, or very nearing up. I would try to take any questions if anyone has any. No questions. Thank you very much, your honors. I appreciate the time. May it please the court. And Mr. Davis. My name is Tom Woodrow and I represent Bridgestone, America's Tire Operations. For simplicity's sake, I think we'll probably call them Firestone today. That's what most of us remember the company being called. Exclusivity is a critically important component of the workers' comp system in Illinois. It is one of the cornerstones and this court has been at the of employer-employee disputes and injuries to keep that litigation in the comp system. The plaintiffs, Mr. Davis, I have to agree with him. What the court really needs to do here, your honors, is to look at those essentially four times because they really didn't change very much over the course of the four amended complaints. And the court thoughtfully concluded that those allegations were basically conclusions. And the court also concluded, and this comes through very clearly, that those allegations do not allege the requisite specific intent to injure with the requisite specificity required to create an exception to exclusivity. If I were talking to maybe a sophisticated high school class or a pre-law class at a university and they were acquainted with asbestos litigation, specifically the intentional tort side of asbestos litigation, and they asked me, how are these other plants and industries, how does that compare with the asbestos problem in terms of pleading and why are those asbestos companies getting sued for intentional but Firestone is alleged to have done many of the same things and had knowledge for not back into the 19th century but the early part of the 20th century. How would I explain that to a lay audience that one could go forward but the other couldn't? Your Honor, I think the easiest way to explain that is that there are different diagnosis results from these materials or chemicals. Asbestos has been proven for a very long time to cause mesothelial and asbestosis. There's only one cause of those two diseases and that's inhalation of asbestos. I think we also know, I'm sure Your Honors know from your experience here, the asbestos world kind of is on its own. It's a unique place where things happen because of the unique situation there. In the benzene world, if you will, and we have some guidance from this and I think we gave this less shrift than we should have in our brief, Your Honors, the U.S. Supreme Court has spoken directly to this issue. In 1980, in the International Union Department versus American Petroleum case. In that case, in 1980, the Supreme Justice Stevens writing for the court concluded that it was not appropriate for OSHA to mandate a standard that would require industries like ours, and many others by the way, because solvents are used in many other manufacturing facilities, not just tire manufacturing facilities. It was improper to mandate those industries to require 1 ppm of exposure of benzene as opposed to the current 10. And the reason it was inappropriate is because the science did not demonstrate that the difference between exposing employees to 10 ppm of benzene versus 1 had any significant increase in a risk. The court also noted in that case that what we were talking about was a risk of causing blood-forming cancers, not the substantial certainty that Mr. Davis indicates. That's an enormous and significant difference, Your Honors. And in fact, if we look at the plaintiffs in this case, what do we have? Eight different diseases out of 13 plaintiffs. Eight different ones. Years in the plant between 3 and 30. Some of these plaintiffs worked for 3 years, others worked for 30. Those guys that worked for 30 were not older workers whenever they were exposed to whatever Mr. Davis in the complaint alleges they were. And it's not clear, by the way, what they were exposed to because the complaint, neither in paragraphs 80 through 120 or anywhere else, explain what they were exposed to. The diagnoses came in between 1980 and 2006. And the workers worked 18 different job classifications by my count. And that's in the complaint. I suspect there were probably between 40 and 80 different job classifications at the plant in Decatur. These guys all did different things, these workers. They were not doing the same thing over and over again. And also, tire manufacturing facilities and others that use solvents are not closets. They're large facilities. Many, many football fields in size with very high ceilings and ventilation and no air conditioning so fans working in the summertime. And that, Your Honor, is the difference. The asbestos workers were usually in very close proximity to the insulation that was primarily the cause of their conditions. The workers in other manufacturing facilities, oil refineries, dry cleaning plants, tire manufacturing facilities, other rubber facilities where solvents and cements are used, it's much more varied. It's much different. And we are not talking about exposure to benzene in its pure form. The Supreme Court in the International Union case refers to that. Early on, as Mr. Davis was referring to in the 20s and the 30s, there was a link between exposure to pure benzene and cancer. What we're talking about now, and I think what the plaintiff is trying to hoist ahead here with, is that trace benzene in solvents, traces of between 1%, 2%, 3%, sometimes less than 1%, that exposure to those sorts of solvents can cause these conditions. And what we know from this complaint is that 13 out of thousands of workers have a condition or are alleged to have a condition that relates to their employment. 13. That is not an epidemic. It is an unfortunate circumstance. But it is a condition that is covered by the Occupational Disease Act so long as the plaintiffs can meet the time component. So I believe there is a difference, Your Honor, and it's a difference in terms of what the material really is and how the workers are exposed to it. The complaint in this case, that's an interesting distinction. Is it a distinction for trial as opposed to a distinction regarding intent to harm or a way to escape exclusivity provision? I don't believe so, Your Honor. I believe that the issue about whether there will be a trial or not, in other words, whether this complaint will stand or not, really deals with the allegations therein and not perhaps a difference between asbestos and benzene. And if, Your Honor, where you're headed with this is why did Hanley come out the way it did and why have other cases come out the way they have, I think I have an explanation for that. The trial court in Hanley and the appellate court in Hanley got it right based on what was available to them to follow. And that was the Collier case. The Collier case had not yet, the appellate courts had not yet gotten to the point that we got to in Ryherd and then in Copas requiring the employee to show a specific intent to injure. All of these allegations that Mr. Davis went through, they definitely don't sound very nice. They definitely are not favorable to Firestone. But on the other hand, they do not show specific intent to injure any one of the single plaintiffs in this case. There is no link between this activity, between allegedly removing a label from what was it. Do we know who used it? No. And I point that out, Your Honors, because I believe that what has happened here in terms of the exclusivity issue and the relationship between the employer and the employee is a highly personal one. This complaint is highly impersonal. This complaint sounds like a tort case. This complaint makes the same sorts of allegations that we see in all sorts of different product liability cases. The defendant knew they were making something bad or they knew they were doing something bad. They didn't tell anybody and the plaintiff was hurt as a result. In the tort context, that's enough. In our context, if it's an employer versus an employee situation, much, much more is required. Much, much more. And it gets personal. It gets down to what did Mr. Durbin, for example, who specifically intended to injure Mr. Durbin? What did they say? What did they do? What did they provide him with? Where did he work? Those are the questions. And the Heartline case, which came somewhat closely on the heels of COPAS, goes directly to that. The court says we need more specificity. We don't disagree with the Hanley case. We don't think the court got it wrong. But the court did not evaluate in Hanley the factual allegations under the specific intent to injure standard. And that is why with allegations that were essentially identical in the Hanley case and the 1995 later Heartline case, the Heartline court says the complaint was properly dismissed. It does not show the requisite specific intent to injure by the employer. All of this is done, Your Honors, in the context of a system. A system that allows the employees who are injured certain recovery within a very specified period of time and it allows the employers certainty as to the result. That's what's being preserved. That's what's more important. And when we see allegations in that 80 to 120 that mention that Firestone had a safety manual, that Firestone entered into a study with the University of North Carolina jointly with the union, that it had a safety director. The safety director said in his deposition very clearly and that's in the complaint, we did not expose our employees to carcinogens. It says in paragraph 113, Firestone was aware its employees were dying from cancers of the blood and blood forming organs, but it acted to conceal its knowledge and continued to knowingly put employees in harm's way. That's not factual pleading. That's a conclusion. That's an argument. And that's what paragraphs 80 through 120 are. It's a closing argument. Your Honors, the Copas case was really this court's launching into the area that requires the courts in Illinois to, and employees in Illinois, to plead specific cases. Copas has not been questioned. It has been widely followed and it has been acknowledged by both other appellate courts and by the federal courts here in Illinois as the standard. And finally, I'm trying to go through the points that I wanted to make sure I addressed from Mr. Davis' comments and there was one that I wanted to make sure that I pointed out to the court. Mr. Davis referred to the Keele study and this is a very good example of what this complaint does and what it tries to do. The Keele study did not involve any Firestone plants. I don't think it mentioned Firestone. But what Keele concluded was consistent with what the U.S. Supreme Court concluded in the International Union case is that in the rubber industry, by virtue of use of solvents, there was an increased risk of lymphomas. An increased risk. Not a certainty. Not a substantial certainty. Not everyone in the industry knew that this was happening and something must be done. An increased risk. What this complaint does is take pieces like that and conclude somehow, without any factual backup, that Firestone put older workers in areas of the plant that use these solvents more than in other areas. It's simply implausible. And the work histories of these plaintiffs as set out in the complaint indicate just how implausible that is. They say it, but they don't show it. They conclude it, but they don't allege it. At the end of the day, this is a tort case. It is not an intentional tort case. It's a tort case. And Firestone, like all other employers in the state of Illinois, is entitled to the protection of Section 5 and the exclusivity that it provides. Your Honors, unless you have other questions, I would prefer to stand on the brief on all other questions, particularly the issues of appellate jurisdiction. The purpose in our raising those was we just thought it was incumbent upon us because the case came to you in an odd posture. It was not final. And there are still counterclaims pending, or that were pending, when this came to you between the supplier defendants and Firestone, as one example. So unless there are any questions, Your Honors. Counselor, Mr. Davis said that no standard is good enough for Firestone, essentially saying that your position is it's always got to be workers' comp. And there's nothing that they could have pledged, no matter what they put into the complaint, which would have withstood, according to your position, a motion to dismiss. How do you respond to that? My response to that, Your Honor, is that in this scenario, I believe that's probably correct. You know, it's not supposed to be easy to get around Section 5. It's a tough standard for a reason. And in a manufacturing facility where there are thousands of workers working at the same time, moving around in lots of different areas where chemicals, where solvents, where electricity, where water, where all sorts of things are being used in the processes. Unless there's a specific, unusual attempt by the employer to truly go after an employee, I believe that the result, being hurt, having an illness, whatever it is, whatever the result is, whatever the injury is, that is a result of the manufacturing facility. It's not a result of the employer's specific intent to hurt you. So I think it is tough in this context. So the intent to hurt has to be specific as to a given plaintiff? I believe that that's what HEARTLINE stands for, Your Honor. And I believe that's why it's so – I think that's why it's so difficult for these plaintiffs in this case to accomplish what they're trying to accomplish. Because the allegations are very broad, they're very general. They're about the manufacturing facility as a whole and how it operates. And basically they're saying all these bad things are happening in the facility and these 13 guys were working there and they ended up with a disease and so we specifically intended to injure them. That doesn't cut it under HEARTLINE, and I don't think it cuts it under HANDLER, and it certainly doesn't cut it under COPUS. Time is almost up, Your Honor, unless there are any other questions. Thank you very much. Thank you. May I please report? Justice Turner, I'd like to be able to pick up with the question that you asked my opponent with regard to directing specific intent to a particular employee at a particular location at a particular time. To adopt that level is to inject a completely new and unheard of standard into specific intent and to the exceptions to exclusivity. It's just simply not the law. And in order to grasp that concept, if that concept were grasped, it would effectively abrogate anybody's ability, whether it's in an asbestos plant, whether it's in a plant that makes PVC pipes using vinyl chloride, whether it's an entire building plant, to ever bring a claim that's outside the exclusivity doctrine of Section 5. And certainly that's not the public policy of this State, nor has it ever been, nor I would submit should it ever be. Our position in our reply brief, and I didn't bring this up in my initial argument because of time constraints, but I will stand on the brief in that regard, is that specific intent has never been specifically, to use an overused term, enunciated by the Illinois Supreme Court. In the Fergot case, certainly the decision was that it just has to be non-accidental. And we do submit that the substantial certainty standard is a more acceptable standard to allow these claims to go forward. But even under the specific intent standard, it isn't anywhere near what Mr. Woodrow is suggesting on behalf of Firestone should be the burden that the plaintiffs bear, especially at the 2615 stage of litigation. And Justice Connick, you brought up what differences, if any, exist between the manufacturer of asbestos-containing products and a product that uses organic compounds, including benzene, to become vinyl. And we would submit to you that there's absolutely no difference. You know, the evidence pled in this case, and again, it's a bit of a catch-22 because we did post witnesses, but the record does establish that the workers at the Firestone Tire and Rubber plant were literally doused with these solvents, that they had 20 minutes for lunch, 20 minutes for lunch, to get from one side of the plant, which is under, I believe, 90 or 100 acres of roof, to the cafeteria to eat lunch. And what they would do is they would wash their hands in these solvents to clean the black rubber off of their hands. They wouldn't have washed their hands in it if they'd known it was a carcinogen, so they could go eat lunch and have enough time to get back and continue production within the 20-minute allotted time period. Those are the facts that were developed in this case. If there was ever a case that at the 615 level should allow the intentional court exception to exclusivity to go forward, it's this one, no doubt in my mind. With regard to the cases that were cited, Harpine is distinguishable, and the court in that case pointed out that the key language was that the employer manifested its intent to kill, but yet it was really a substantial or strong probability standard masked with some very vague language about its specific intent. And they did their own examination, as they are allowed to do, the appellate court, to dismiss or uphold dismissal. And with regard to, I believe, another case, the Kopass case, the Kopass case, it was a negligence case. Failure to train, failure to instruct the employee how to put together the pipes that ultimately exploded. That truly was a negligence case in sheep's clothing, and that's not what this case is. We've pled all the requisite elements. We've borne the burden. And I would close by saying, as Justice Knecht pointed out, that the points that were made during my opponent's argument are more perfect for closing argument at trial in front of a jury of 12, rather than at this stage of the proceeding, which is on the pleadings and must be restricted to whether or not we've stated a claim upon which relief can be granted. That's all I have. If there are any questions, I'll take those. Otherwise, I will sit down. Thank you, counsel. Thanks. Good arguments on both sides. Thank you, sir. Very good.